**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT HOLLY,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **STRYKER CORPORATION and** | : | |
| **STRYKER SALES CORPORATION,** | : | **No. 18-702** |
| **Defendants.** | : | |

## MEMORANDUM

**Schiller, J.**                                                                                            **February 27, 2019**

Robert Holly worked for Stryker Sales Corporation[1] as a sales representative for more than 25 years before Stryker terminated his employment in April 2017. Although Holly met his sales quotas at the company almost every year, his tenure was not always smooth-sailing. Both parties agree that, beginning in 2011, several Stryker customers lodged complaints against Holly. Eventually, Stryker placed Holly on two different performance and behavior plans to address these customer grievances and to warn Holly that additional complaints could result in his termination. However, the plans were unsuccessful. After yet another complaint in March 2017, Holly was fired.

Although Holly does not dispute that customers made these complaints, he argues that Stryker used the complaints as pretext to fire him. As the oldest sales representative working under his regional manager, Holly asserts that Stryker fired him because of impermissible age discrimination and brings claims under both the Age Discrimination in Employment Act

---

[1] Stryker Sales Corporation is a subsidiary of Stryker Corporation. (Defs.' Statement of Undisputed Material Facts [Defs.' SUF] ¶ 1.) Because the parties do not distinguish between the two entities and they jointly move for summary judgment, the Court will simply refer to them collectively as "Stryker" or "Defendants."

("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Stryker moved for summary judgment. For the reasons that follow, the Court grants Stryker's motion and dismisses all of Holly's claims against Defendants.

## I. BACKGROUND

Holly began working for Stryker as a commission-based sales representative in its surgical business unit in 1991. (Defs.' SUF ¶¶ 2, 5.) As a sales representative, Holly was responsible for "selling, marketing, and servicing" Stryker's surgical instruments, which are used in orthopaedic and other medical procedures, to customers within a geographic territory. (*Id.* ¶¶ 2, 6.) Although Holly's assigned territory was always within the greater Philadelphia area, its size and his specific customers changed through periodic territory "realignments." (*Id.* ¶¶ 10-15.) Approximately every two to three years, Stryker altered the sales representatives' territories, often to create new "expansion territories" to "drive sales by putting additional sales reps on the ground" and increase "market penetration." (*Id.* ¶¶ 12, 14.) Holly typically lost approximately twenty percent of his assigned customers with each realignment. (*Id.* ¶ 15.) Nonetheless, Holly met or exceeded his annual sales quota in twenty-two of his twenty-five years at Stryker. (*Id.*)

Stryker is committed to "superior service" for its customers. (*Id.* ¶ 22.) As such, sales representatives have a variety of duties aimed at customer service, including maintaining strong relationships with customers, responding to questions about Stryker's products, providing information about new products, being present in hospital operating rooms ("ORs") or available to surgeons and staff, and conducting product training for customers and their staff. (*Id.*)

Despite Holly's success in sales, he did not always excel in customer service. In January 2011, William Varrichio became the regional manager supervising Holly. (*Id.* ¶ 24.) During his first six months as Holly's supervisor, Varrichio received four separate complaints regarding

Holly: from two representatives at Main Line Health System; from the contract manager at the University of Pennsylvania Health System; from a number of OR nurses and managers working at Holly's accounts; and from the chief orthopaedic surgeon and the vice president of perioperative services at Thomas Jefferson University's Hospital. (*Id.* ¶¶ 26-27; 31; 32-34, 38, 40-41.) Given the volume of complaints, Varrichio started a log of the feedback he was receiving about Holly. (*Id.* ¶¶ 42-43.) Varrichio's investigation of the complaints at Jefferson revealed that some of the problems with Stryker were not attributable to Holly. (Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts [Pl.'s SUF] ¶¶ 44-45; Varrichio Decl., Ex. B, C.) But because some were, Varrichio counseled Holly on how to improve the relationship with Jefferson. (Defs.' SUF ¶¶ 55-56; Sandak Decl., Ex. 13.) At that time, however, Varrichio did not remove Holly from the Jefferson account. (Defs.' SUF ¶ 56.)

Following these 2011 incidents, Varrichio continued to receive customer complaints about Holly. In July 2012, the materials manager at Physicians Care Surgical Hospital told Varrichio that, although she and her staff had had several positive experiences with Holly, they also had concerns about Holly amounting to "trust/respect issues." (*Id.* ¶¶ 57-59; Sandak Decl., Ex. 11.) Just two months later, Varrichio learned that Jefferson was contemplating purchasing products from Stryker's competitors due to concerns about Holly. (Defs.' SUF ¶ 66.) In a follow-up phone call about this in October 2012 with Jefferson's contracts manager, Varrichio learned, as he documented in his review log of Holly, that "the doctors do not like [Holly], and no longer want to deal with him. They were clear that the[] only way they would want to continue with Stryker . . . was if [Holly] was no longer the rep." (*Id.* ¶ 68.) After further investigation about the Jefferson complaint, Varrichio removed Holly from the account. (*Id.* ¶ 72.) Holly admits that, after a new representative was assigned to Jefferson, the orthopaedic coordinator thanked Varrichio for

making the change, noting that the new representative "has been a godsend" and expressing that "Stryker really took our concerns about representation seriously and gave us exactly what we needed." (*Id.* ¶ 73.)

Negative feedback about Holly continued into 2013. In January and September, representatives from both Main Line Health System and Einstein Health System, respectively, expressed dissatisfaction with Holly to his new regional manager, Toby Pare. (*Id.* ¶¶ 78-80.) Pare informed Holly about the complaint from Einstein. (*Id.* ¶ 83.) But this did not put an end to Holly's problems with his customers. In early 2014, the system director at Main Line Health System again complained about Holly. (*Id.* ¶ 85.)

In June 2015, another customer, this time Nazareth Hospital, contacted Pare about issues with Holly. (*Id.* ¶ 86.) During a phone call, which Pare documented contemporaneously in an email to himself, the Nazareth Hospital material management specialist expressed her staff's dissatisfaction with Holly, adding that he was "rude and obnoxious." (*Id.*) The following day, the Nazareth representative sent a follow-up email to Pare, stating that "the consensus is that Bob Holly is not liked, or wanted as our rep." (*Id.* ¶ 89.) She went on to say that the doctors have asked "not to have [Holly] in their rooms due to his lack of professionalism" and that the Nazareth chief of surgery "stated that he lacks ethics." (*Id.*) The chief of surgery himself called Pare to express personally his frustration with Holly, going so far as to say that Stryker "would be better off with a dead body as the sales rep"; again, Pare documented this phone call in an email to himself, with his direct supervisor and a human resources manager copied. (*Id.* ¶ 92.) When Pare confronted Holly about this complaint, Holly asked Pare to speak with the OR director at Nazareth about him. (*Id.* ¶ 97.) Pare complied with Holly's request and, although the OR director indicated that she did not have any personal problem with Holly, she confirmed that others did. (*Id.* ¶ 98.)

Nazareth's complaint was not the only one made against Holly around June 2015. Pare learned that month that Abington Memorial Hospital System's Lansdale Hospital was looking into buying power equipment from a Stryker competitor because they did not like Holly. (*Id.* ¶ 99.) Pare met with a Lansdale surgeon to learn more about the hospital's concerns. (*Id.* ¶ 100.) The surgeon "confirmed that Lansdale had tried to purchase Synthes power tools solely to avoid working with Holly" and also stated that Holly's bad customer service was the "worst kept secret in Philly." (*Id.* ¶ 100.)

Pare placed Holly on a Performance and Behavioral Plan ("PBP") in late June 2015. (*Id.* ¶ 102.) In addition to summarizing some of the complaints about Holly, going back as far as 2012, the PBP stated that "immediate and sustained improvement is required" and that "no more complaints from customers, coworkers, or any related party concerning [his] service, lack of follow up, or any interaction—during or away from work" will be tolerated. (*Id.* ¶ 104; Pare Decl., Ex. D.) The PBP further stated that "failure to meet expectations may result in further disciplinary action, up to and including immediate termination, at any time." (*Id.* ¶ 104; Pare Decl., Ex. D.)

More than a year passed without a complaint against Holly and, in January 2016, Holly was congratulated for meeting his 2015 sales quota. (Pl.'s SUF ¶ 149; Davitch Decl., Ex. 20.) But by August 2016, Pare received a new complaint, this time from the University of Pennsylvania Health System's Penn Presbyterian. (Defs.' SUF ¶¶ 107-08.) Specifically, the OR manager indicated that "she and the Penn Presbyterian surgeons disliked Holly and that she did not trust him." (*Id.* ¶ 108.) She also expressed that "Holly was never at the hospital unless a trial was being conducted." (*Id.*) That same day, Penn Presbyterian's Director of Materials Management, Arthur Schimmel, told Pare that the hospital's chief financial officer "had instructed him to reach out to

Holly's supervisor" to discuss employee concerns about Holly. (*Id.* ¶ 109.) The minutes of an internal committee at the hospital corroborated these instructions. (*Id.* ¶ 110.)

When Pare confronted Holly about this complaint, Holly brushed off the complaints by saying that two of the women who had expressed dissatisfaction with him were "mean-spirited," "angry," and "disgruntled." (*Id.* ¶ 115.) Pare followed up with several of the individuals who purportedly disliked Holly and, per Holly's request, spoke with another Stryker representative who worked at Penn Presbyterian as well as other staff there. (*Id.* ¶¶ 116-19.) While the Stryker representative acknowledged difficulty working with one of the Penn Presbyterian complainants, he also confirmed that all the accounts he and Holly shared "[didn't] like working with [Holly]" and "[didn't] seem to respect [Holly] and typically roll[ed] their eyes when his name [was] mentioned." (*Id.* ¶ 118; Pl.'s SUF ¶ 118; Sandak Decl., Ex. 25.)

Following the complaint from Penn Presbyterian, Pare decided not to terminate Holly or even to remove him from the Penn Presbyterian account. (Defs.' SUF ¶¶ 121-22.) However, he did place Holly on a second PBP in late September 2016. (*Id.* ¶¶ 122-23.) The second PBP mentioned the complaints made by Jefferson, Einstein, Nazareth, Lansdale, and Penn Presbyterian, and stated that "[t]he main concern . . . is the frequency with which they occur." (*Id.* ¶ 123; Pare Decl., Ex. F.) The document also stated that Stryker "expect[s] that there will be no further complaints from customers related to your service" and that "failure to meet expectations will result in immediate termination, at any time." (Defs.' SUF ¶¶ 124-25.)

Within six months of the second PBP, Holly was again the subject of a complaint by a Stryker customer. In March 2017, the Director of Perioperative Services at Aria-Bucks Hospital, Patricia Leichner, complained to Pare that Holly sold the hospital Stryker's five-year old System 7 power tools without informing her about Stryker's imminent launch of the new System 8 line.

(*Id.* ¶ 129.) Indeed, the sale was finalized the same month that System 8 was officially launched. (Pl.'s SUF ¶ 129.) Leichner testified that she was "very upset" that she was sold the older system without knowing anything about the newer system. (Defs.' SUF ¶ 131.) When Pare notified Holly about the complaint, Holly admitted that he had not notified her of the new system, but explained his decision. (*Id.* ¶ 133.) To make amends with Aria-Bucks, Pare ultimately decided to give all three Aria hospital campuses the new batteries used in System 8 tools—the defining feature of the new System—free of charge. (*Id.* ¶ 135.)

Following the complaint from Leichner, Stryker decided to terminate Holly's employment in April 2017. (*Id.* ¶ 137.) The parties dispute precisely why Stryker terminated Holly. Holly contends that it was solely due to the Aria-Bucks complaint that happened while his second PBP was still in place. (Pl.'s SUF ¶ 137.) Stryker characterizes its decision slightly differently: Holly was terminated because there was another customer complaint against him, in violation of his second PBP, and he had a long history of "particularly harsh" customer complaints for "which he had been counseled and warned." (Defs.' SUF ¶ 137.) The parties agree that, after his termination, Stryker offered Holly severance benefits. (Pl.'s SUF ¶ 152.)

Although Holly disputes the veracity, significance, and ultimate resolution of several of the complaints lodged against him, he does not dispute that each complaint was made. Nor does he provide evidence that other Stryker sales representatives received differential treatment after customer complaints were made against them. Holly admits that, during Pare's time as the regional manager, two sales representatives were the subject of complaints and neither received more favorable treatment than Holly. (Defs.' SUF ¶ 82.) Like Holly, one was placed on a PBP, but there were no further complaints about him before he resigned. (*Id.*) The other went onto medical leave following the complaint and never returned to work. (*Id.*) Other than these examples, Holly

testified that "he knows of no sales rep, other than himself, about whom a Stryker customer complained to Stryker management." (*Id.* ¶ 95.)

At the time of his termination, Holly was 61 years old, making him the oldest sales representative within his region, for which Pare was the regional manager. (Pl.'s SUF ¶¶ 142-43.) After Holly's termination, a territory realignment resulted in the creation of a new territory, which included a number of Holly's old accounts. (Defs.' SUF ¶ 140.) Thus, a sales representative hired in March 2017 for the newly created territory and another veteran Stryker sales representative were each assigned some of Holly's accounts after his termination. (Pl.'s SUF ¶ 153.) The two representatives who received Holly's former accounts were 27 and 30 years old. (*Id.* ¶ 144.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32

F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

Holly sued Stryker for discrimination under both the ADEA and PHRA, and Stryker moved for summary judgment on both claims. Because Holly fails to demonstrate weaknesses in Stryker's articulated reason for firing Holly, such that a reasonable factfinder could disbelieve the reason given, the Court grants Defendants' motion.

### A.     ADEA Framework

The ADEA prohibits employers from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Under the ADEA, a plaintiff must show "that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). When, as here, a plaintiff relies on circumstantial evidence to prove age discrimination, the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Under that framework, the initial burden of production is on the plaintiff to show a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. Once this is established, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* The third step "afford[s the plaintiff] a fair opportunity to show that [the defendant's] stated reason for [plaintiff's] rejection was in fact pretext." *Id.* at 804.

Because the Third Circuit "has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA," the Court will not differentiate

between the two claims. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

### B.      Prima Facie Case

To establish a prima facie case of age discrimination, a plaintiff must show four elements: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Willis*, 808 F.3d at 644. The Third Circuit has indicated that "there is a low bar for establishing a *prima facie* case of employment discrimination." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

There is no dispute that Holly has established the first two elements of his *prima facie* case. At the time of his termination, he was 61 years old. Being fired, as Holly was, constitutes an adverse employment decision. Regarding the third and fourth elements of the *prima facie* case, Stryker states that "[f]or purposes of this motion, and without waiver of the argument that Holly fails to establish a *prima facie* case," Defendants will "focus their argument" on the second and third prongs of the burden-shifting framework. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. [Defs.' Br.] at 18, n.10.) Based on this, Holly similarly focused his opposition on the subsequent stages of the *McDonnell Douglas* test. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. [Pl.'s Br.] at 11.) Given that the parties essentially assume that Holly has established a *prima facie* case for purposes of this summary judgment motion, the Court will do the same.

### C.      Legitimate Nondiscriminatory Reason

After a plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate a legitimate nondiscriminatory reason for the adverse employment action."

*Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999). At this stage, the employer need

not prove that their articulated reason "was the actual reason for the adverse employment action."

*Willis*, 808 F.3d at 644. The Third Circuit has noted that the employer's burden at this stage is

"relatively light" and "is satisfied if the employer provides evidence, which, if true, would permit

a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*

*v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

Here, Stryker has asserted that it terminated Holly based on the customer complaints about

him. (Defs.' Br. at 19.) Plaintiff has not contested that this is a legitimate nondiscriminatory

rationale for termination, and rightly so. Courts in this district have found this same proffered

reason sufficient to meet the employer's burden of production at the second stage of the

*McDonnnell Douglass* framework. *See, e.g.*, *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597,

611 (E.D. Pa. 2014) (granting summary judgment for defendant employer, who stated that reason

for plaintiff's termination was customer complaint). Accordingly, Stryker has met its burden.

### D.      Pretext

Once the employer satisfies the second step, the plaintiff again has the burden "to show,

by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory

reason was pretextual." *Willis*, 808 F.3d at 644. To succeed at this stage, "the plaintiff must point

to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). In order to cast enough

doubt onto the employer's proffered reasons, a plaintiff "must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765. It is not enough simply to "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*

"[T]o avoid summary judgment, the plaintiff's evidence . . . must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is pretext)." *Id.* at 764. However, if the plaintiff has met this burden, "she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment . . . because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Burton*, 707 F.3d at 427. Thus, direct evidence of discriminatory intent is not necessary for the plaintiff to prevail at the summary judgment stage. *Id.*

Holly points to five pieces of evidence to demonstrate that "Stryker's articulated reasons [for terminating Holly] are riddled with contradictions, inconsistencies, and implausibilities." (Pl.'s Br. at 13-20.) None of the evidence persuades the Court.

### i. Stryker's Failure to Comply with its Own Disciplinary Policy

First, Holly argues that, by predicating its decision to fire Holly on complaints that predated Holly's June 2015 PBP, Stryker failed to follow its own "corrective action and progressive disciplinary policy," which Holly contends constitutes evidence of pretext. (*Id.* at 13-14.) According to Holly, the June 2015 PBP was a "written warning," as defined by Stryker's employee handbook, which the Stryker policy treats as "active" for only one year. (*Id.* at 14.) Thus, after one

year without any complaints, the first PBP was no longer "active" and should have been "expunged." (*Id.*) Because Stryker now purports to rely on the series of complaints made against Holly, not just the final complaint made against him in March 2017, Holly argues that Stryker is not treating those earlier complaints as "expunged" as its own disciplinary policy required. (*Id.*) Embedded within this argument is a secondary one: "most of the customer complaints themselves are inadmissible hearsay" and thus cannot be considered by the Court. (*Id.* at 14-15.)

In response, Stryker points to testimony from its director of human resources that the corrective action policy referenced by Holly does not actually apply to performance plans. (Defs.' Reply Mem. of Law in Supp. of Summ. J. Mot. [Defs.' Reply] at 2-3.) With regard to Holly's hearsay objection to the complaints predating the first PBP, Stryker contends that it "proffers this evidence to establish that the complaints were made, that they were made frequently and by different customers, and that Stryker continued to receive them, even after the issuance of two PBPs, and to thus show Pare's state of mind in issuing the PBPs and, ultimately, in deciding to terminate Holly's employment." (*Id.* at 4.) Because of this, none of the complaints are hearsay. (*Id.*)

On both points, the Court agrees with Stryker. Holly has not provided evidence to contradict the human resources director's testimony that the cited corrective action policy did not apply to Holly's performance plans. (Sandak Reply Decl., Ex. 1, Ferschweiler Dep., at 32-39.) Indeed, the pages of Stryker's employee handbook specifically distinguish between "corrective action," which is active for one year, and a "performance improvement plan," again corroborating the human resources director's testimony that this policy did not govern Holly's discipline. (Davitch Decl., Ex. 8, Employee Handbook, at 32.)

13

Even assuming that the corrective action policy applied to Holly, Holly has not pointed to evidence that Stryker took any action that was actually inconsistent with it. The policy itself states that "[w]hile the intent of the corrective action process is to be progressive, the Company reserves the right to begin corrective action at any step and/or to bypass certain steps, depending on the nature and severity of the infraction and the employee's prior corrective action or performance record." (*Id.*) Further, it states that "Stryker reserves the right to review the performance of an employee at any point in time to address performance that may result in corrective action or a performance improvement plan." (*Id.*) Nowhere in the pages cited by Holly does the policy state that performance plans—or other written warnings—will be "expunged," as Holly claims. Here, the record establishes that Holly was progressively punished over a series of years—beginning with verbal warnings followed by placement on, not one, but two performance plans. This is consistent with the policy identified by Holly.

Further, the Court rejects Holly's contention that the earlier complaints are inadmissible hearsay. As Stryker rightfully argues, the issue is not whether each complaint made against Holly was true but, rather, whether the complaint was made—and then relied on by Stryker in making its termination decision. Thus, the earlier complaints are not offered for the truth of the matter asserted and fall outside the rules against hearsay.

Taken together, Holly has not demonstrated that the policy cited applies to his performance plans; that even if it did, Stryker diverged from the policy such that there is evidence of pretext; or that the complaints predating the June PBP are hearsay. This argument fails to discredit Stryker's proffered reason for terminating Holly.

*ii. Inaccuracy, Exaggeration, and Contradictions of Other Customer Complaints*

Holly next argues that the complaints from Penn Presbyterian and Aria-Bucks are "inaccurate, exaggerated, and directly refuted by the record." (Pl.'s Br. at 15.) Holly points to several specific issues with these two complaints, which he contends show that these complaints were not the real reason he was terminated but are rather merely pretext for age discrimination.

With regard to the Penn Presbyterian complaint, which led to the creation of Holly's second PBP in September 2016, Holly contends that some of the details about who complained about him and the nature of those complaints are inaccurately summarized within the PBP. (*Id.*) The person who reported the complaint to Stryker, Arthur Schimmel, testified that he could not recall whether he ever told Pare that "clinicians" at Penn Presbyterian did not like Holly, as the PBP indicated. (Robert Davitch Decl., Ex. 11, Schimmel Dep., at 12.) Rather, he could only recall that two staff members, an OR manager and the director of processing, had expressed complaints about Holly. (*Id.* at 8.) Given that these individuals were not "clinicians," Holly contends that the PBP summary was false and therefore supports an inference of pretext. Holly also takes issue with the description of the complaints made to Schimmel and then relayed to Stryker. While the PBP states that the complaints related to Holly's "very aggressive" behavior, Holly points out that Schimmel testified that the two staff members had actually complained about Holly calling them too frequently. (*Id.* at 9.) The Court notes, however, that Schimmel himself characterized the complaints from these two staff as being about Holly's aggressive behavior. (*Id.* at 8-9.) Holly also points to the testimony of two individuals at Penn Presbyterian who said they themselves had no problems with Holly. (Pl.'s Br. at 15-16.)

Holly next takes issue with Stryker's reliance on the complaint in March 2017, immediately preceding his termination, from Patricia Leichner at Aria-Bucks, who was unhappy that Holly

never told her about the impending launch of a new line of Stryker power tools before she purchased the older version. Specifically, Holly points out that Leichner's complaint is factually inaccurate: she complained that Holly did not disclose that Stryker "had launched" the new line, but Holly points out that the sale was completed nine days before the official "launch" took place. (*Id.* at 16-17.) Further, Holly takes issue with his regional manager Pare's contention that Leichner felt "duped" by Holly, since Leichner simply testified that she was "upset" by Holly's actions. (*Id.* at 17.) Instead, Holly contends that Pare simply invented this ulterior motive as a "post hoc fabrication" to justify Holly's termination. (*Id.*)

The Court is not persuaded that Holly has shown any disputes of material fact within the record. As Stryker points out, Pare's notes from his meeting with Schimmel track the language in the PBP and Schimmel testified that those notes were accurate. (Defs.' Reply at 7-8.) The only real disparity between Schimmel's testimony and the PBP is whether Schimmel reported that the complaints were exclusively from "staff" rather than "clinicians." But this minor distinction does not somehow make Stryker's reliance on the complaint implausible; Holly's customer service duties spanned both staff and clinicians at his respective accounts. Similarly, the fact that some staff at Penn Presbyterian liked Holly while others did not is irrelevant to the motion now before the Court. Whether these complaints were fully substantiated is beside the point, given that "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). The discrepancies Holly has pointed to in the Penn Presbyterian complaint testimony are not ones that suggest this complaint did not actually motivate the decision to place Holly on a second PBP and ultimately to terminate him.

The same is true of Holly's contentions about the Aria-Bucks complaint. Holly admits that Leichner testified that she was upset that Holly had not told her about the new power tools; that she complained about this; that this complaint was a direct violation of the second PBP; and that Stryker therefore decided to fire him. Whether Leichner understood that the new power tools had not officially launched at the time the sale was finalized is beside the point; she was upset and she complained about Holly, after Holly had been warned that he could be terminated as a result of customer complaints. The Court is in no position to second-guess the wisdom of Stryker's decision to fire Holly following this complaint. As another court in this district has explained, "[i]f an employer relies on statements and complaints . . . when making a decision to terminate an employee, the employee cannot later establish pretext by simply challenging the veracity of such statements. So long as the decision-maker reasonably credited the allegations, an employee's denial is not enough to establish pretext." *McCormick v. Allegheny Valley Sch.*, Civ. A. No. 06-3332, 2008 WL 355617, at *16 (E.D. Pa. Feb. 6, 2008). That conclusion also applies here.

### iii. Belated Reliance on Customer Complaints

Third, Holly contends that, if the complaints against him were "a genuine basis for [his] termination," he "should have been terminated long before April 24, 2017." (Pl.'s Br. at 18.) In other words, Holly argues that belated reliance on criticisms can be reasonably viewed as evidence tending to show pretext. (*Id.*) Stryker responds by pointing the Court to the "abundant evidence showing that Holly's supervisors were concerned about the complaints made against Holly, that they repeatedly communicated those concerns to Holly and counseled him, and that Pare placed him on two PBPs as a result of the complaints." (Defs.' Reply at 11.) Further, Stryker points out that, as a result of complaints from Jefferson and Nazareth, Holly was actually removed from those accounts long before his ultimate termination. (*Id.*)

This argument fails to discredit Stryker's proffered reason for terminating Holly. Holly cites cases from the Second and Seventh Circuits in which the employers had tolerated the plaintiffs' poor managerial and interpersonal skills, only to cite those qualities later as the reason for terminating each employee. *See Levin v. Analysis & Tech., Inc.*, 960 F.2d 314, 317 (2d Cir. 1992); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426-27 (7th Cir. 1992). Unlike in those cases, however, the record evidence here does not show that Stryker was consistently tolerant of Holly's customer service problems, only to suddenly change its views on this long-standing behavior. As Stryker notes, it investigated the complaints, kept a log of each complaint, confronted Holly about most of them, took disciplinary action against Holly, and even removed him from accounts based on the complaints. Holly's argument—essentially that he should have been fired sooner—is not evidence of pretext.

### iv. *Shifting and Inconsistent Reasons Stated for Termination*

Fourth, Holly argues that he "can demonstrate pretext due to the shifting and inconsistent reasons Stryker has provided for his termination." (Pl.'s Br. at 18.) At the time of his termination, Holly claims that Pare said he was terminated solely based on the complaint from Aria-Bucks; Holly also characterizes Pare's supervisor William Varrichio's testimony in that way. (*Id.* at 19.) But now, in its motion for summary judgment, Stryker says Holly's termination was due to the "number and intensity" of the customer complaints going back as far as 2011 and 2012. (*Id.*) Holly points to this change as evidence that "Stryker cannot keep its story straight." (*Id.*)

The Court finds this argument unpersuasive. Looking at the record evidence, the Stryker human resources director involved in Holly's termination and Varrichio each testified that Holly was terminated because another complaint was made against Holly, in violation of his PBP. (Sandak Reply Decl., Ex. 1, Ferschweiler Dep., at 13-14; Ex. 5, Varrichio Dep., at 20-21, 72-74.)

That PBP reflected the fact that numerous customers had complained about Holly and that the complaint that precipitated the second PBP was not simply an isolated instance. Indeed, the second PBP stated that "[t]he main concern . . . is the frequency with which they occur." (Defs.' SUF ¶ 123; Pare Decl., Ex. F.) Pare similarly cited the history of customer complaints made against Holly, as well as the March 2017 complaint while Holly was on a PBP, as the reasons for his termination. (Pare Decl. ¶ 23; Sandak Decl., Ex. 4, Pare Dep., at 63, 116.) Holly himself testified that, at his April 2017 termination meeting, he and the Stryker representatives in attendance discussed his PBP and the fact that his latest complaint violated it. (Sandak Reply Decl., Ex. 2, Holly Dep., at 461-62.) While Stryker has now emphasized that Holly was terminated due to the series of complaints made against him, this does not constitute "inconsistent" reasons for terminating Holly, suggestive of pretext.

### v. Offer of Severance Benefits

In his final argument, Holly asserts that Stryker's decision to offer him severance benefits is further evidence of pretext, because this was contrary to Stryker's usual policy. (Pl.'s Br. at 19-20.) In response, Stryker points to testimony that "Holly was offered severance based on his tenure and to assist him with employment transition" and argues that "it is not unusual for Stryker to offer a separation package, even in 'for cause' terminations." (Defs.' Reply at 13.) Stryker also emphasizes that Holly was offered a severance package only *after* the termination decision was made and the decision to offer the severance package was not made by Holly's supervisors who made the decision to terminate him. (*Id.*)

The Court is not persuaded that Stryker's decision to offer Holly severance is evidence of pretext. As an initial matter, the record evidence establishes that Stryker's decision to offer a severance package "really depends on the situation." (Sandak Reply Decl., Ex. 1, Ferschweiler

Dep., at 21.) Here, a severance package was offered because of Holly's "long tenure." (*Id.*) The fact that Stryker was willing to offer severance to a long-term employee is not evidence of pretext.

## IV. CONCLUSION

Even construing the record evidence in the light most favorable to Holly, he has failed to proffer evidence sufficient to cast doubt on Stryker's legitimate, nondiscriminatory reason for terminating him. For the reasons discussed above, Defendants' motion for summary judgment is granted and all claims against them are dismissed. An Order consistent with this Memorandum will be docketed separately.